70 A.3d 630

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. THOMAS W. EARLS, DEFENDANT–APPELLANT.

Argued October 22, 2012—Reargued January 29, 2013—Decided July 18, 2013.

*Alison S. Perrone,* Designated Counsel, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney).

*Brian J. Uzdavinis,* Deputy Attorney General, argued the cause for respondent (*Jeffrey S. Chiesa,* Attorney General of New Jersey, attorney).

*Rubin M. Sinins* argued the cause for amici curiae The American Civil Liberties Union of New Jersey Foundation and The Association of Criminal Defense Lawyers of New Jersey (*Edward L. Barocas,* Director, attorneys; *Mr. Sinins, Mr. Barocas, Alexander R. Shalom, Jeanne M. LoCicero,* and *Jeffrey S. Mandel,* on the briefs).

*Grayson Barber* and *Alan Butler,* a member of the California bar, argued the cause for amicus curiae Electronic Privacy Information Center (*Ms. Barber,* attorney; *Ms. Barber, Mr. Butler,* and *Marc Rotenberg,* a member of the Massachusetts and District of Columbia bars, and the United States Court of Appeals, on the briefs).

Chief Justice RABNER delivered the opinion of the Court.

Advances in technology offer great benefits to society in many areas. At the same time, they can pose significant risks to individual privacy rights. This case highlights both principles as we consider recent strides in cell-phone technology. New improvements not only expand our ability to communicate with one another and access the Internet, but the cell phones we carry can also serve as powerful tracking devices able to pinpoint our movements with remarkable precision and accuracy.

In this appeal, we consider whether people have a constitutional right of privacy in cell-phone location information. Cell phones register or identify themselves with nearby cell towers every seven seconds. Cell providers collect data from those contacts, which allows carriers to locate cell phones on a real-time basis and to reconstruct a phone's movement from recorded data. Those developments, in turn, raise questions about the right to privacy in the location of one's cell phone.

Historically, the State Constitution has offered greater protection to New Jersey residents than the Fourth Amendment. Under settled New Jersey law, individuals do not lose their right to privacy simply because they have to give information to a third-party provider, like a phone company or bank, to get service. *See State v. Reid*, 194 *N.J.* 386, 399, 945 *A.*2d 26 (2008). In addition, New Jersey case law continues to be guided by whether the government has violated an individual's reasonable expectation of privacy.

Applying those principles here, we note that disclosure of cell-phone location information, which cell-phone users must provide to receive service, can reveal a great deal of personal information about an individual. With increasing accuracy, cell phones can now trace our daily movements and disclose not only where individuals are located at a point in time but also which shops, doctors, religious services, and political events they go to, and with whom they choose to associate. Yet people do not buy cell phones to serve as tracking devices or reasonably expect them to be used

by the government in that way. We therefore find that individuals have a reasonable expectation of privacy in the location of their cell phones under the State Constitution.

We also recognize that cell-phone location information can be a powerful tool to fight crime. That data will still be available to law enforcement officers upon a showing of probable cause. To be clear, the police will be able to access cell-phone location data with a properly authorized search warrant. If the State can show that a recognized exception to the warrant requirement applies, such as exigent circumstances, then no warrant is needed.

Having a clear set of rules serves two key goals. It protects legitimate privacy interests and also gives guidance to law enforcement officials who carry out important public safety responsibilities. Because today's decision creates a new rule of law that would disrupt the administration of justice if applied retroactively, the rule will apply to this defendant and prospective cases only.

The issue before the Court arises in the case of a burglary investigation. In an effort to locate the target and his girlfriend, whose safety was in question, the police obtained cell-phone location information from T–Mobile on three occasions during the same evening—without first getting a court order or a warrant.

The trial court found that defendant had a reasonable expectation of privacy in his cell-phone location information but admitted the evidence under the emergency aid exception to the warrant requirement. The Appellate Division affirmed on different grounds. It concluded that defendant lacked a reasonable expectation of privacy in his cell-phone location information and that the police lawfully seized evidence in plain view. The panel had no reason to consider the emergency aid doctrine.

Because we find that cell-phone users have a reasonable expectation of privacy in their cell-phone location information, and that police must obtain a search warrant before accessing that information, we reverse the judgment of the Appellate Division. To determine whether the emergency aid doctrine or some other

exception to the warrant requirement applies to the facts of this case, we remand the matter to the Appellate Division for further proceedings.

## I.

We draw the following facts from testimony at the suppression hearing in this case. In January 2006, Detective William Strohkirch of the Middletown Township Police Department was investigating a series of residential burglaries. After a victim told Strohkirch that a cell phone stolen from his home was still active, a court-ordered trace of the phone led the police to a bar in Asbury Park. Strohkirch and two other officers found an individual at the bar with the phone, and they arrested him. He told the police that his cousin, defendant Thomas Earls, had sold him the phone. He added that defendant had been involved in residential burglaries and kept the proceeds in a storage unit that either defendant or his former girlfriend, Desiree Gates, had rented.

The police found Gates the next day at her cousin's home, and Gates agreed to cooperate in the investigation. Gates confirmed that she had leased a storage facility in Neptune, which defendant had paid for, and the trial court found that she consented to a search of the unit. That issue is not before us.

Several detectives accompanied Gates and her cousin to the storage unit. Because defendant had the only key to the unit, the officers cut the lock. Inside, the police found various items they believed were stolen, including golf clubs, flat-screen televisions, expensive jewelry, and sports memorabilia. Gates denied any knowledge of the items.

Strohkirch spoke with Gates's cousin the following day, January 26, 2006. She said that she had not seen Gates since the visit to the storage unit and was concerned about Gates's safety. According to the cousin, defendant learned about Gates's cooperation and threatened to harm her. The cousin also relayed that defendant and Gates had "some domestic violence situations" in the past. Strohkirch was able to locate an Asbury Park police report from

December 2005, which outlined an allegation by Gates that defendant had assaulted her.

At some point on January 26, 2006, the police filed a complaint against defendant for receiving stolen property and obtained an arrest warrant. Strohkirch then began to search for defendant and Gates to ensure her safety and to execute the warrant.

In an effort to locate them, the police contacted T–Mobile, a cell-phone service provider, at about 6:00 p.m. At three different times that evening, T–Mobile provided information about the location of a cell phone the police believed defendant had been using. First, at around 8:00 p.m., T–Mobile told the police that the cell phone in question was in the "general location" of Highway 35 in Eatontown.[1] The police searched the area but did not find defendant or Gates.

Second, at about 9:30 p.m., the police again contacted T–Mobile, which reported that the cell phone was being used in the area of Routes 33 and 18 in Neptune. The police searched that area in response but did not find defendant. Finally, after the police called T–Mobile at around 11:00 p.m., the carrier reported that a cell-site tower in the area of Route 9 in Howell had been used. At no point did the police seek a warrant for the three traces.

---

[1] Strohkirch testified as follows: "We learned that the cell tower site that was ... being used ... was in the ... Eatontown area. They would give us a *general location* of Highway 35 in Eatontown." (Emphasis added). In the trial court's factual findings, it noted that "the Middletown Police Department was contacted by T–Mobile and informed that the cell phone was being used *within a one-mile radius* of the cell tower located at the intersection of Highway 35 and 36 in Eatontown." (Emphasis added).

We cannot find sufficient credible support in the record for the factual finding that the cell-site information was accurate within a one-mile radius. *See State v. Rockford,* 213 *N.J.* 424, 440, 64 *A*.3d 514 (2013); *State v. Minitee,* 210 *N.J.* 307, 317, 44 *A*.3d 1100 (2012). No one suggests the area exceeded a one-mile radius, but we cannot determine how narrow the area of coverage was—for example, whether it was less than a mile radius—from the evidence in the record before us. For purposes of this decision, we assume that the area was one mile at most.

Local police departments assisted Strohkirch throughout the evening. At around midnight, the Howell Police Department located defendant's car at the Caprice Motel on Route 9 in Howell. A local officer stayed in the area to watch the car. Meanwhile, Strohkirch and Detective Deickman of the Middletown Police drove to the motel together. When they arrived at about 1:00 a.m., the officer on site reported that he had not seen any movement and that all of the motel rooms were dark.

The officers decided to call for backup from the Howell Police Department out of concern for a potential hostage situation. At about 1:30 a.m., additional officers arrived, but they left the scene because of an emergency elsewhere in Howell. Strohkirch and Deickman remained and called for additional officers from their department. Strohkirch testified that he did not believe that two officers could safely apprehend defendant.

At about 3:00 a.m., two hours after Strohkirch and Deickman first arrived at the motel, two police officers from Middletown arrived. At that point, Deickman spoke with a clerk in the motel office who confirmed where Gates and defendant were staying. Deickman called their room from the clerk's office to ask Gates to come outside. When defendant and Gates opened the door, the police arrested him. The police saw a flat-screen television and several pieces of luggage on the floor of the room. Inside a closed dresser drawer, the police found a pillowcase tied in a knot.

The police brought defendant and the items to headquarters, where defendant signed consent-to-search forms. Inside the luggage, the police found stolen property and marijuana. The pillowcase contained stolen jewelry.

A Monmouth County Grand Jury returned an indictment against defendant charging him with third-degree burglary, *N.J.S.A.* 2C:18–2, third-degree theft, *N.J.S.A.* 2C:20–3a, third-degree receiving stolen property, *N.J.S.A.* 2C:20–7a, and fourth-degree possession of a controlled dangerous substance (marijuana), *N.J.S.A.* 2C:35–10a(3).

Defendant filed a motion to suppress. On April 27, 2007, after a three-day hearing, the trial court upheld the seizure of evidence from the storage unit and the motel room, except for the contents of the pillowcase. The court also denied defendant's motion to suppress evidence seized from his car and apartment. Our focus in this appeal is on defendant's arrest, based on the location of the cell phone, and the resulting consequences.

The trial court found that defendant had a reasonable expectation of privacy in the location of his cell phone under State law and that the police should have obtained a warrant before tracking defendant via cell-tower information from T–Mobile. Nonetheless, the court concluded that the emergency aid exception to the warrant requirement applied. In the trial court's judgment, recent events—including Gates's cooperation with the police, defendant's threat to harm her, her absence, and her prior domestic-violence complaint against defendant—provided an objectively reasonable basis to believe that Gates was in physical danger. The trial court also found that the television and luggage in the motel room were lawfully seized in plain view, that the State had not established that defendant or Gates orally consented to a search of the motel room, and that defendant gave written consent at headquarters to search the luggage.

Defendant pled guilty on September 28, 2007 to third-degree burglary and third-degree theft. On November 2, 2007, the court sentenced defendant in accordance with a plea agreement to an aggregate, extended term of seven years' imprisonment with three years of parole ineligibility. The Appellate Division affirmed defendant's sentence on June 23, 2009, and later allowed defendant to reopen his appeal to challenge the suppression ruling.

In a published opinion, the Appellate Division affirmed the trial court's order for different reasons. *State v. Earls*, 420 *N.J.Super.* 583, 591, 22 *A.*3d 114 (App.Div.2011). The appellate panel "conclude[d] that defendant had no constitutionally protected privacy interest in preventing T–Mobile from disclosing information concerning the general location of his cell phone." *Ibid.* The court

explained that individuals have "no reasonable expectation of privacy in their movements on public highways or the general location of their cell phone." *Id.* at 599, 22 *A.*3d 114. As a result, the panel had no reason to consider whether the emergency aid doctrine applied in this case. *Id.* at 591, 22 *A.*3d 114. The panel did find that the television and luggage in the motel room were properly seized under the plain view exception to the warrant requirement. *Id.* at 591, 600, 22 *A.*3d 114.

We granted defendant's petition for certification "limited to the issues of the validity of defendant's arrest based on law enforcement's use of information from defendant's cell phone provider about the general location of the cell phone and the application of the plain view exception to the warrant requirement." 209 *N.J.* 97, 35 *A.*3d 680 (2011). We also granted motions from the American Civil Liberties Union of New Jersey (ACLU) and the Association of Criminal Defense Lawyers (ACDL), who filed a joint application, and the Electronic Privacy Information Center (EPIC) to participate as amici curiae.

We heard oral arguments on October 22, 2012. Afterward, we asked the parties and amici to address whether a determination that a warrant is required to obtain cell-phone location data would constitute a new rule of law and whether such a ruling should be applied retroactively. We also requested information about the current state of technology relating to cell-phone location tracking and whether cell-phone users today have a reasonable expectation of privacy in modern cell phones. The case was reargued on January 29, 2013.

## II.

Defendant argues that he had a reasonable expectation of privacy in his cell-phone location information and that a warrant was therefore needed before law enforcement officials could access that information. He submits that technology now allows law enforcement to track the location of cell phones in an intrusive, continuous manner and thereby threatens to erode protected

privacy rights. Defendant argues that the traditional distinction between public and private realms is no longer valid because cell-phone tracking monitors a person's movements in and out of both areas.

In a supplemental brief, defendant maintains that it would be a logical extension of existing precedent to require police to get a warrant before they can request cell-phone location data. Such an approach, he claims, would not constitute a new rule of law and should be applied retroactively.

The Attorney General claims that defendant had no reasonable expectation of privacy in the generalized location of his cell phone. The State contends that the non-specific information it obtained during a brief period of time directed officers to public areas and differed from today's more sophisticated and precise tracking data. The State acknowledges that location information available today could raise constitutional concerns and that, unless there is an emergency, police now typically obtain warrants before seeking that type of data. To the extent defendant had a privacy interest in the location of his cell phone, the Attorney General asserts that the emergency aid exception to the warrant requirement would apply here.

In its supplemental brief, the State submits that imposing a warrant requirement would amount to a new rule of law that should apply prospectively only.

The arguments of amici amplify defendant's position on the constitutional issue. The ACLU and ACDL, in a joint brief, contend that there is a reasonable expectation of privacy in cell-phone location information under the State Constitution. According to the two amicus groups, such information can reveal intimate details about one's affairs and intrude upon the constitutional right of association. The groups therefore argue that law enforcement must get a warrant supported by probable cause before it can gather such information. Absent a warrant, they argue that the exclusionary rule should apply.

In their supplemental brief, the ACLU and ACDL contend that a warrant requirement does not constitute a new rule of law. They concede that if this Court rules otherwise, the issue of retroactivity is a close question.

EPIC also maintains that individuals have a reasonable expectation of privacy in the location of their cell phones. EPIC argues that real-time cell-phone location tracking can be more invasive than Global Positioning System (GPS) tracking and involves a level of intrusion that a reasonable person would not anticipate. In its supplemental brief, EPIC offered helpful details about the current state of cell-phone technology.

### III.

For a better understanding of the issues presented, we begin by examining how cell phones function. We draw on congressional testimony by Professor Matt Blaze of the University of Pennsylvania, *see* ECPA Reform and the Revolution in Location Based Technologies and Services: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm. on the Judiciary, 111th Cong. 12–30 (2010) (statement of Prof. Matt Blaze) ("Blaze Testimony"), and other sources.

A basic cell phone operates like a scanning radio. Cell phones use radio waves to communicate between a user's handset and a telephone network. *Id.* at 20. To connect with the local telephone network, the Internet, or other wireless networks, cell-phone providers maintain an extensive network of cell sites, or radio base stations, in the geographic areas they serve. *In re U.S. Historical Cell Site Data,* 747 *F.Supp.*2d 827, 831 (S.D.Tex.2010).

Whenever a cell phone is turned on, it searches for a signal and automatically registers or identifies itself with the nearest cell site—the one with the strongest signal. Blaze Testimony, *supra,* at 20. The process is automatic. Cell phones re-scan every seven seconds, or whenever the signal strength weakens, even when no calls are made. *See In re Pen Register & Trap/Trace Device with Cell Site Location Auth.,* 396 *F.Supp.*2d 747, 750 (S.D.Tex.2005).

Cell phones can be tracked when they are used to make a call, send a text message, or connect to the Internet—or when they take no action at all, so long as the phone is not turned off. *See* Blaze Testimony, *supra*, at 13–14. Today, cell-phone providers can pinpoint the location of a person's cell phone with increasing accuracy. In some areas, carriers can locate cell-phone users within buildings, and even within "individual floors and rooms within buildings." *Id.* at 25.

The degree of accuracy in tracking a cell phone depends on the type of mobile device, the type of tracking method, the service provider, and other factors. We consider two main types of mobile phone devices: cell phones and smartphones. Smartphones are an advanced version of basic cell phones that can be used not only to make calls and send text messages but also to connect to the Internet, among other features. *See* Stephanie K. Pell & Christopher Soghoian, *Can You See Me Now? Toward Reasonable Standards for Law Enforcement Access to Location Data That Congress Could Enact*, 27 *Berkeley Tech. L.J.* 117, 129 (2012). Those connections create countless cell-site records that facilitate tracking. *See id.* at 130; Blaze Testimony, *supra*, at 27.

There are two primary methods to track mobile devices: network-based (cell-site) and handset-based (GPS). Blaze Testimony, *supra*, at 20–21.

Network-based location tracking relies on the network of cell sites and antennas described above. As mobile devices register with a cell site, make a call, or download data, they "communicate" with a station through radio signal data that is collected and analyzed at the provider's cell towers. *Id.* at 22. That process enables carriers to identify "the position of virtually every handset active in the network at all times." *Ibid.* The information is typically created and stored in a database. *Id.* at 27. A log is also ordinarily created each time a call is made or data downloaded. *Ibid.*; Pell & Soghoian, *supra*, 27 *Berkeley Tech. L.J.* at 128.

The accuracy of the location information depends in part on the size of the "sector"—the area served by the cell tower. Blaze

Testimony, *supra*, at 23–24. That area can range from miles to meters. *Id.* at 25. As the number of cell towers or base stations increases, the size of the sector shrinks and tracking becomes more precise. *Id.* at 24–25.

From 2000 to 2012, as cell phones became more popular, the number of cell towers in the United States increased from 104,288 to 301,779. CTIA—The Wireless Ass'n, *Wireless Industry Survey Results* (Dec. 2012), http://files.CTIA.org/pdf/CTIA_Survey_YE_2012_Graphics-FINAL.pdf. As a direct consequence, not only are carriers able to accommodate new customers and provide better reception, but they can also locate cell phones with greater precision. In dense urban areas and environments that use "microcells"—newer, smaller cellular base stations—a sector's coverage area can be "quite small indeed." Blaze Testimony, *supra*, at 25 (explaining that microcells can "sometimes effectively identify[ ] . . . individual floors and rooms within buildings"); *Historical Cell Site Data, supra*, 747 *F.Supp.*2d at 833 (noting "microcell has a range of 40 feet" (citations omitted)). New Jersey, of course, is the most densely populated state in the nation. *See* U.S. Census Bureau, *Resident Population Data: Population Density* (2010), http://www.census.gov/2010census/data/apportionment-dens-text.php.

Handset-based tracking uses GPS technology to locate cell users. Blaze Testimony, *supra*, at 21. The GPS system is comprised of "orbiting satellites that provide navigation data to military and civilian users" throughout the world. U.S. Air Force, *Global Positioning System Factsheet* (Sept. 15, 2010), http://www.af.mil/information/factsheets/factsheet.asp?id=119. Most modern phones contain GPS receivers, *see* Jagdish Rebello, *Four Out of Five Cell Phones to Integrate GPS by End of 2011* (July 16, 2010), http://www.isuppli.com/Mobile-and-Wireless-Communications/News/Pages/Four–out–of–Five–Cell–Phones–to–Integrate–GPS–by–End–of–2011.aspx, and "the user's phone calculates its own location" with "GPS satellite receiver hardware built in to the handset," Blaze Testimony, *supra*, at 20–21. GPS technology

works reliably outdoors, *id.* at 22, and "can precisely locate something to within about 10 meters of accuracy," *id.* at 14.

Many modern cell phones contain a GPS chip that can be used for emergency tracking. For example, new handsets sold by Verizon Wireless since December 31, 2003 have a chip in the phone that helps provide location information. *See* Verizon Wireless, *Wireless Issues: Enhanced 911* (2013), http://aboutus. verizonwireless.com/commitment/safety_security/.

Each carrier has its own practice to collect and retain location data. Blaze Testimony, *supra,* at 27. With more accurate information available, carriers can now collect more precise data about the location of cell phones that their customers use. *Ibid.; Historical Cell Site Data, supra,* 747 *F.Supp.*2d at 833–34.

The number of users has increased steadily as well. From 2000 to 2012, the estimated number of wireless devices in the United States grew from 109.4 million to 326.4 million. CTIA, *supra.* As of May 2013, the Pew Research Center reported that 91 percent of American adults have a cell phone and 56 percent have a smartphone. Pew Research Ctr., *Pew Internet: Mobile* (June 6, 2013), http://pewinternet.org/Commentary/2012/February/Pew-Internet-Mobile.aspx.

### IV.

We turn next to relevant federal and state law relating to location information.

### A.

The United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." *U.S. Const.* amend. IV. To determine whether a violation of the Fourth Amendment had occurred, earlier cases focused on whether the government had violated an individual's reasonable expectation of privacy. *See, e.g., Kyllo v. United States,* 533 *U.S.* 27, 31–33, 121

*S.Ct.* 2038, 2042–43, 150 *L.Ed.*2d 94, 101–02 (2001) (discussing Justice Harlan's frequently quoted concurrence in *Katz v. United States,* 389 *U.S.* 347, 360, 88 *S.Ct.* 507, 516, 19 *L.Ed.*2d 576, 587 (1967) (Harlan, J., concurring)).

Two cases after *Katz* addressed the government's use of beepers or electronic tracking devices. *See United States v. Knotts,* 460 *U.S.* 276, 103 *S.Ct.* 1081, 75 *L.Ed.*2d 55 (1983); *United States v. Karo,* 468 *U.S.* 705, 104 *S.Ct.* 3296, 82 *L.Ed.*2d 530 (1984). In *Knotts, supra,* the United States Supreme Court upheld the warrantless monitoring of a beeper that law enforcement had placed in a container of chloroform. 460 *U.S.* at 285, 103 *S.Ct.* at 1087, 75 *L.Ed.*2d at 64. The decision relied heavily on the public nature of the target's activities. Police followed the target's car, where the container had been placed, as it traveled on public streets and highways. *Id.* at 281, 103 *S.Ct.* at 1085, 75 *L.Ed.*2d at 62. They maintained visual contact with the car and used a monitoring device located in a helicopter when they lost the signal from the beeper. *Id.* at 278, 103 *S.Ct.* at 1083, 75 *L.Ed.*2d at 60. Because the Court concluded that the defendant had no reasonable expectation of privacy in his car's movement on public roads, *id.* at 281–82, 103 *S.Ct.* at 1085–86, 75 *L.Ed.*2d at 62, no warrant was required. If "dragnet-type law enforcement practices" occur in the future, the Court observed, "there will be time enough then to determine whether different constitutional principles may be applicable." *Id.* at 284, 103 *S.Ct.* at 1086, 75 *L.Ed.*2d at 63.

In *Karo, supra,* by contrast, the Supreme Court reviewed the warrantless monitoring of a beeper that "reveal[ed] information that could not have been obtained through visual surveillance." 468 *U.S.* at 707, 104 *S.Ct.* at 3299, 82 *L.Ed.*2d at 536. The police had placed a beeper in a container of ether, which the target transported on public roads but also stored in private homes. *Id.* at 708–09, 104 *S.Ct.* at 3299–300, 82 *L.Ed.*2d at 537. The Court found that the monitoring violated justifiable Fourth Amendment interests in the privacy of a home. *Id.* at 714, 104 *S.Ct.* at 3303, 82 *L.Ed.*2d at 541. As the Court explained, "[e]ven if visual surveil-

lance has revealed that the article to which the beeper is attached has entered the house, the later monitoring not only verifies the officers' observations but also establishes that the article remains on the premises." *Id.* at 715, 104 *S.Ct.* at 3303, 82 *L.Ed.*2d at 541. Read together, the cases found no reasonable expectation of privacy in the monitoring of tracking devices in public, as opposed to private, areas.

By recent standards, the devices used were relatively primitive. The beeper in *Knotts, supra,* had a limited range and required physical surveillance so that law enforcement would be close enough to receive a signal. 460 *U.S.* at 278, 103 *S.Ct.* at 1083, 75 *L.Ed.*2d at 60. That is no longer the case. With more modern cell phones, as discussed above, data is collected remotely by way of contacts with cell towers, and the information is automatically recorded and stored. Also, radio signals travel to cell towers from both public and private locations.

Decisions that have applied *Knotts* and/or *Karo* to cell-site data are divided. Some have found that the government's use of cell-site information to get a general location does not violate the Fourth Amendment. *See, e.g., United States v. Skinner,* 690 *F.*3d 772, 777–78 (6th Cir.2012); *United States v. Forest,* 355 *F.*3d 942, 950–52 (6th Cir.2004), *remanded on unrelated sentencing grounds by* 543 *U.S.* 1100, 125 *S.Ct.* 1050, 160 *L.Ed.*2d 1001 (2005); *United States v. Navas,* 640 *F.Supp.*2d 256, 263–64 (S.D.N.Y.2009), *rev'd on other grounds,* 597 *F.*3d 492 (2d Cir.2010); *Devega v. State,* 286 *Ga.* 448, 689 *S.E.*2d 293, 300–01 (2010). Other courts have found that the Fourth Amendment requires that police get a warrant to obtain cell-site data. *See, e.g., In re U.S. for Order Authorizing Release of Historical Cell–Site Info.,* 809 *F.Supp.*2d 113, 119–20 (E.D.N.Y.2011) (seeking long-term, historical information); *Historical Cell Site Data, supra,* 747 *F.Supp.*2d at 846 (same); *see also In re U.S. for Order Directing Provider of Elec. Commc'n Serv. to Disclose Records to Gov't,* 620 *F.*3d 304, 313, 319 (3d Cir.2010) (allowing government to obtain cell-site location information on showing of less than probable cause but recognizing

magistrate judge's discretion to require warrant to protect privacy interests).[2]

A recent decision of the United States Supreme Court that rests on principles of trespass has altered the landscape somewhat. *See United States v. Jones,* 565 *U.S.* ——, 132 *S.Ct.* 945, 181 *L.Ed.*2d 911 (2012). *Jones* held that the physical installation of a GPS device on a car amounted to a Fourth Amendment search and required a warrant. *Id.* at ——, 132 *S.Ct.* at 949, 181 *L.Ed.*2d at 918. Federal officers had attached a GPS tracking device to a car, without a valid warrant, and pinpointed the car's movements to within 50 to 100 feet for nearly one month. *Id.* at ——, 132 *S.Ct.* at 948, 181 *L.Ed.*2d at 916–17.

The Court unanimously found a violation of the Fourth Amendment but split on the underlying basis. The majority opinion by Justice Scalia, joined by Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor, held that the installation of the device constituted a trespass on private property. *Id.* at ——, 132 *S.Ct.* at 949–54, 181 *L.Ed.*2d at 918–23. The decision did not

---

[2] A number of federal courts have considered whether a warrant is required to obtain cell-site information under the federal pen register statute, *see* 18 *U.S.C.A.* § 3122, and the Stored Communications Act, *see* 18 *U.S.C.A.* § 2703. Some have required a warrant. *See, e.g., In re U.S. for Order Relating to Target Phone 2,* 733 *F.Supp.*2d 939, 941 (N.D.Ill.2009) (citing cases); *In re U.S. for Orders Authorizing Installation & Use of Pen Registers & Caller Identification Devices on Tel. Nos. [Sealed] & [Sealed],* 416 *F.Supp.*2d 390, 396–97 (D.Md.2006); *see also In re U.S. for Order Authorizing (1) Installation & Use of Pen Register & Trap & Trace Device or Process, (2) Access to Customer Records, & (3) Cell Phone Tracking,* 441 *F.Supp.*2d 816, 837 (S.D.Tex.2006) (requiring more than court order).

Others have not required a warrant. *See, e.g., United States v. Graham,* 846 *F.Supp.*2d 384, 403–04 (D.Md.2012), *appeal docketed,* No. 12–4659 (4th Cir. Aug. 22, 2012); *In re U.S. for Order Authorizing Use of Two Pen Register & Trap & Trace Devices,* 632 *F.Supp.*2d 202, 206–07 (E.D.N.Y.2008); *In re U.S. for Order: (1) Authorizing Installation & Use of Pen Register & Trap & Trace Device, & (2) Authorizing Release of Subscriber & Other Info.,* 433 *F.Supp.*2d 804, 806 (S.D.Tex.2006); *In re U.S. for Order: (1) Authorizing Installation & Use of Pen Register & Trap & Trace Device; & (2) Authorizing Release of Subscriber Info. & /or Cell Site Info.,* 411 *F.Supp.*2d 678, 682 (W.D.La.2006). Among other factors, the cases considered the scope of the information requested.

address whether the defendant had a reasonable expectation of privacy that was violated when the police monitored the device. *Id.* at ——, 132 *S.Ct.* at 950, 181 *L.Ed.*2d at 919.

Yet five members of the Court discussed expectation of privacy concerns. Justice Alito, in a concurring opinion joined by Justices Ginsburg, Breyer, and Kagan, would have analyzed the case under *Katz. See id.* at ——, 132 *S.Ct.* at 958, 181 *L.Ed.*2d at 927 (Alito, J., concurring). In light of modern cell phones and other wireless devices that "permit more precise tracking," and allow carriers to "record the location of users," Justice Alito would have asked "whether the use of GPS tracking in a particular case involved a degree of intrusion that a reasonable person would not have anticipated." *Id.* at ——, 132 *S.Ct.* at 963–64, 181 *L.Ed.*2d at 933–34. In his view, "relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable"; "[b]ut the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." *Id.* at ——, 132 *S.Ct.* at 964, 181 *L.Ed.*2d at 934 (citation omitted).

Justice Sotomayor joined the majority opinion. In a concurrence, though, she also agreed with Justice Alito that longer term tracking impinges on expectations of privacy. *Id.* at ——, 132 *S.Ct.* at 955, 181 *L.Ed.*2d at 925 (Sotomayor, J., concurring). "[E]ven short-term monitoring," she cautioned, "will require particular attention" because "GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about … familial, political, professional, religious, and sexual associations." *Ibid.* (citation omitted).

Both concurring opinions also noted that modern tracking devices offer an inexpensive alternative to traditional physical surveillance, which could only have been accomplished with a large group of agents. *Id.* at ——, 132 *S.Ct.* at 956, 181 *L.Ed.*2d at 925; *id.* at ——, 132 *S.Ct.* at 963–64, 181 *L.Ed.*2d at 933–34 (Alito, J., concurring).

B.

▉ Article I, Paragraph 7 of the New Jersey Constitution is nearly identical to the Fourth Amendment. Despite the similarity in language, the protections against unreasonable searches and seizures "are not always coterminous." *State v. Hunt*, 91 *N.J.* 338, 344, 450 *A.*2d 952 (1982). On a number of occasions, this Court has found that the State Constitution provides greater protection against unreasonable searches and seizures than the Fourth Amendment. *See, e.g., Reid, supra*, 194 *N.J.* at 389, 945 *A.*2d 26 (recognizing reasonable expectation of privacy in Internet subscriber information); *State v. McAllister*, 184 *N.J.* 17, 19, 875 *A.*2d 866 (2005) (finding reasonable expectation of privacy in bank records); *State v. Mollica*, 114 *N.J.* 329, 344–45, 554 *A.*2d 1315 (1989) (finding privacy interest in hotel-room telephone toll billing records); *State v. Novembrino*, 105 *N.J.* 95, 159, 519 *A.*2d 820 (1987) (declining to find good-faith exception to exclusionary rule); *Hunt, supra*, 91 *N.J.* at 345, 450 *A.*2d 952 (finding privacy interest in telephone toll billing records).

At the outset, we note that an individual's privacy interest under New Jersey law does not turn on whether he or she is required to disclose information to third-party providers to obtain service. *See Reid, supra*, 194 *N.J.* at 399, 945 *A.*2d 26; *McAllister, supra*, 184 *N.J.* at 31, 875 *A.*2d 866; *Hunt, supra*, 91 *N.J.* at 347, 450 *A.*2d 952. Just as customers must disclose details about their personal finances to the bank that manages their checking accounts, cell-phone users have no choice but to reveal certain information to their cellular provider. That is not a voluntary disclosure in a typical sense; it can only be avoided at the price of not using a cell phone.

When people make disclosures to phone companies and other providers to use their services, they are not promoting the release of personal information to others. *See Reid, supra*, 194 *N.J.* at 399, 945 *A.*2d 26; *McAllister, supra*, 184 *N.J.* at 31, 875 *A.*2d 866; *Hunt, supra*, 91 *N.J.* at 347, 450 *A.*2d 952. Instead, they can reasonably expect that their personal information will remain

private. For those reasons, we have departed from federal case law that takes a different approach. *See Smith v. Maryland,* 442 *U.S.* 735, 743–44, 99 *S.Ct.* 2577, 2582, 61 *L.Ed.*2d 220, 228–29 (1979); *United States v. Miller,* 425 *U.S.* 435, 442–44, 96 *S.Ct.* 1619, 1624, 48 *L.Ed.*2d 71, 79–80 (1976). *But see In re Order to Disclose Records to Gov't, supra,* 620 *F.*3d at 317 ("A cell phone customer has not 'voluntarily' shared his location information with a cellular provider in any meaningful way.").

Beyond the question of third-party disclosure, we have examined the expectation of privacy that people reasonably have in various types of personal information. In *Hunt, supra,* this Court observed that people are "entitled to assume that the [telephone] numbers [they dial] in the privacy of [their] home will be recorded solely for the telephone company's business purposes" and not for law enforcement. 91 *N.J.* at 347, 450 *A.*2d 952. As the Court explained, a list of phone numbers dialed " 'easily could reveal the identities of the persons and the places called, and thus reveal the most intimate details of a person's life.' " *Ibid.* (quoting *Smith, supra,* 442 *U.S.* at 748, 99 *S.Ct.* at 2584, 61 *L.Ed.*2d at 231 (Stewart, J., dissenting)).

Similarly in *McAllister, supra,* the Court noted that bank records " 'reveal[ ] many aspects of [a depositor's] personal affairs, opinions, habits and associations. Indeed, the totality of bank records provides a virtual current biography.' " 184 *N.J.* at 30–31, 875 *A.*2d 866 (citation omitted).

More recently, in *Reid, supra,* we found that Internet "subscriber information alone can tell a great deal about a person. With a complete listing of IP addresses, one can track a person's Internet usage" and learn where they shop, what political organizations they find interesting, their health concerns, and more. 194 *N.J.* at 398, 945 *A.*2d 26 (citation omitted).

We also noted how integrally connected all three areas are to essential activities of everyday life. *Ibid.* As to each, we found that the State Constitution protects the privacy interest at stake.

*Id.* at 399, 945 *A.*2d 26; *McAllister, supra,* 184 *N.J.* at 32–33, 875 *A.*2d 866; *Hunt, supra,* 91 *N.J.* at 347, 450 *A.*2d 952.

We consider the expectation of privacy that should be accorded the location of a cell phone in that context. Using a cell phone to determine the location of its owner can be far more revealing than acquiring toll billing, bank, or Internet subscriber records. It is akin to using a tracking device and can function as a substitute for 24/7 surveillance without police having to confront the limits of their resources. It also involves a degree of intrusion that a reasonable person would not anticipate. *See Jones, supra,* 565 *U.S.* at ——, 132 *S.Ct.* at 964, 181 *L.Ed.*2d at 934 (Alito, J., concurring). Location information gleaned from a cell-phone provider can reveal not just where people go—which doctors, religious services, and stores they visit—but also the people and groups they choose to affiliate with and when they actually do so. That information cuts across a broad range of personal ties with family, friends, political groups, health care providers, and others. *See id.* at ——, 132 *S.Ct.* at 955–56, 181 *L.Ed.*2d at 925 (Sotomayor, J., concurring). In other words, details about the location of a cell phone can provide an intimate picture of one's daily life.

Modern cell phones also blur the historical distinction between public and private areas because cell phones emit signals from both places. In this case, defendant was located in a motel room, not on a public highway. Yet law enforcement had no way of knowing in advance whether defendant's cell phone was being monitored in a public or private space. *Cf. Kyllo, supra,* 533 *U.S.* at 38–39, 121 *S.Ct.* at 2045–46, 150 *L.Ed.*2d at 104–05 (finding it impractical to bar only thermal imaging of "intimate details" because police could not know in advance what through-the-wall surveillance would detect). Cell-phone location information, thus, does more than simply augment visual surveillance in public areas. *See Knotts, supra,* 460 *U.S.* at 282, 103 *S.Ct.* at 1086, 75 *L.Ed.*2d at 63.

Finally, cell-phone use has become an indispensable part of modern life. The hundreds of millions of wireless devices in use

each day can often be found near their owners—at work, school, or home, and at events and gatherings of all types. And wherever those mobile devices may be, they continuously identify their location to nearby cell towers so long as they are not turned off.

## C.

We analyze those considerations under the State's search-and-seizure jurisprudence. We are required to focus on reasonable expectation of privacy concerns.

As a general rule, the more sophisticated and precise the tracking, the greater the privacy concern. The question before the Court, then, is informed by changes in technology, because they affect the level of detail that telephone companies can relay to law enforcement. To be sure, the degree of information available through cell-phone tracking has grown with each passing year. As discussed above, in 2006, cell phones could be tracked to within a one-mile radius or less of the nearest cell tower. Today, that distance has narrowed to the point that cell phones can be pinpointed with great precision—to within feet in some instances. That information is updated every seven seconds through interactions with cell towers, whether the phone is in public or private space. As noted, that continuous process can reveal a great deal of private information about a person's life.

Viewed from the perspective of a reasonable expectation of privacy, what was problematic in 2006 is plainly invasive today. We are not able to draw a fine line across that spectrum and calculate a person's legitimate expectation of privacy with mathematical certainty—noting each slight forward advance in technology. Courts are not adept at that task. Instead, our focus belongs on the obvious: cell phones are not meant to serve as tracking devices to locate their owners wherever they may be. People buy cell phones to communicate with others, to use the Internet, and for a growing number of other reasons. But no one buys a cell phone to share detailed information about their whereabouts with the police. That was true in 2006 and is equally true today.

Citizens have a legitimate privacy interest in such information. Although individuals may be generally aware that their phones can be tracked, most people do not realize the extent of modern tracking capabilities and reasonably do not expect law enforcement to convert their phones into precise, possibly continuous tracking tools.

Law and practice have evolved in this area in response to changes in technology. In 2010, a new statute required that police get a court order for cell-site information on a showing of less than probable cause: "specific and articulable facts showing that there are reasonable grounds to believe that the record or other information ... is relevant and material to an ongoing criminal investigation." *N.J.S.A.* 2A:156A–29e. The statute contains an exception for location information for mobile devices when a "law enforcement agency believes in good faith that an emergency involving danger of death or serious bodily injury to the subscriber or customer" exists. *N.J.S.A.* 2A:156A–29c(4). Moreover, as discussed further below, the Attorney General reports that in recent years, many law enforcement officers have obtained warrants based on probable cause before gathering information about the location of a cell phone. We credit the Attorney General's office for that approach.

For the reasons discussed, we conclude that Article I, Paragraph 7 of the New Jersey Constitution protects an individual's privacy interest in the location of his or her cell phone. Users are reasonably entitled to expect confidentiality in the ever-increasing level of detail that cell phones can reveal about their lives. Because of the nature of the intrusion, and the corresponding, legitimate privacy interest at stake, we hold today that police must obtain a warrant based on a showing of probable cause, or qualify for an exception to the warrant requirement, to obtain tracking information through the use of a cell phone.

By providing greater clarity to the law in this area, we strive to meet two aims: to protect the reasonable expectation of privacy that cell-phone users have and, at the same time, to offer clear

guidance to law enforcement officials so they may carry out important tasks in the interest of public safety. Both the public and the police will be better served by a clear set of rules. To be sure, law enforcement officials will still be able to turn to cell-phone providers to obtain location information, as long as such requests are accompanied by a warrant issued by a neutral magistrate and supported by probable cause. We emphasize that no warrant is required in emergency situations or when some other exception to the warrant requirement applies.

Our ruling today is based solely on the State Constitution. We recognize that *Jones* and *Smith*, to the extent they apply, would not require a warrant in this case.

## V.

■ This opinion announces a new rule of law by imposing a warrant requirement. Since 2010, the law has required that police get a court order for cell-site information based on less than probable cause. *See N.J.S.A.* 2A:156A–29e. Thus, even before today, there was some expectation of privacy as to cell-phone location information, and the police needed a form of judicial authorization to obtain that data.

No case law before 2010 specifically addressed cell-phone location information. *See Reid, supra,* 194 *N.J.* at 389, 945 *A.2d* 26 (requiring grand jury subpoena for Internet subscriber records); *State v. Domicz,* 188 *N.J.* 285, 297, 907 *A.2d* 395 (2006) (same for utility records); *McAllister, supra,* 184 *N.J.* at 36, 875 *A.2d* 866 (same for bank records); *Mollica, supra,* 114 *N.J.* at 345, 554 *A.2d* 1315 (requiring search warrant for hotel-room telephone toll billing records). Although the parties dispute what might have been gleaned from earlier decisions, neither our case law nor the statute required a warrant for cell-phone location information. We conclude that the police could not have reasonably anticipated that a warrant based on probable cause was needed, particularly in light of a statute that instructed otherwise.

■ Because today's holding " 'is sufficiently novel and unantic-
ipated,' " *State v. Knight*, 145 *N.J.* 233, 251, 678 *A.*2d 642 (1996)
(quoting *State v. Lark*, 117 *N.J.* 331, 339, 567 *A.*2d 197 (1989)), we
must determine whether it should be applied retroactively. To do
so, we consider three factors: " '(1) the purpose of the rule and
whether it would be furthered by a retroactive application, (2) the
degree of reliance placed on the old rule by those who adminis-
tered it, and (3) the effect a retroactive application would have on
the administration of justice.' " *Ibid.* (quoting *State v. Nash*, 64
*N.J.* 464, 471, 317 *A.*2d 689 (1974)).

■ We can apply a new rule in one of four ways:

(1) "purely prospectively ... to cases in which the operative facts arise after the
new rule has been announced"; (2) "in future cases and in the case in which the
rule is announced, but not in any other litigation that is pending or has reached
final judgment at the time the new rule is set forth"; (3) " 'pipeline retroactivity,'
rendering it applicable in all future cases, the case in which the rule is announced,
and any cases still on direct appeal"; and (4) "complete retroactive effect ... to all
cases."

[*State v. Henderson*, 208 *N.J.* 208, 301–02, 27 *A.*3d 872 (2011) (quoting *Knight*,
*supra*, 145 *N.J.* at 249, 678 *A.*2d 642).]

We consider each of the retroactivity factors in turn. As to the
first factor, the purposes of the new rule are to protect privacy
interests and deter improper police conduct. Today's decision
requires a heightened standard for disclosure of cell-phone loca-
tion information. It does not preclude untrustworthy evidence
that could undermine the reliability of the trial process. *See State
v. Burstein*, 85 *N.J.* 394, 406–08, 427 *A.*2d 525 (1981). Also,
deterrence is rarely a basis to apply a new rule retroactively. *See
Knight, supra*, 145 *N.J.* at 251, 678 *A.*2d 642; *State v. Catania*, 85
*N.J.* 418, 447, 427 *A.*2d 537 (1981).

As to the remaining two factors, the Attorney General reports
that in recent years, law enforcement officers have obtained
warrants in many cases when they sought cell-phone location data.
In response to this Court's request for additional information, the
State surveyed the twenty-one county prosecutor's offices for a
six-month period in 2012. The limited information the State
obtained revealed that in eighty-five percent of the 600 cases

surveyed, warrants were obtained. Local or municipal police departments handled about sixty cases in which no warrants were sought.

The State notes that this incomplete data requires further analysis. For the most part, the data covers investigations by county prosecutor's offices, not local police departments. The Attorney General reports that since 2006, it has trained members of both the Division of Criminal Justice and strike forces from the county prosecutor's offices to obtain warrants based on probable cause when seeking GPS-based location information. That training did not include members of local police forces. Nor did it extend to requests for more general cell-site location information. Also, when cell-site information was sought as part of a broader application—for example, as part of a request for GPS-tracking information, stored electronic communications, or toll billing records—law enforcement used the higher probable cause standard for the combined application.

We discern two points from the information presented. First, the State cannot provide a complete set of data for the period from 2006 to the present. Second, the data it has supplied may overstate the number of cases in which the State specifically sought warrants for cell-site information. In any event, it is apparent that the results in a substantial number of cases would be jeopardized if the Court applied its holding retroactively. That could cause extensive disruption in the administration of justice.

In light of all three factors, we apply today's holding to defendant Earls and future cases only. As to future cases, the warrant requirement will take effect thirty days from today to allow the Attorney General adequate time to circulate guidance to all state and local law enforcement officials.

For prior cases, the requirement in place at the time an investigation was conducted remains in effect. Starting January 12, 2010, law enforcement officials had to obtain a court order to get cell-site information under *N.J.S.A.* 2A:156A–29e. Failure to

abide by that requirement can be challenged under the law as it existed at the time.

## VI.

We briefly touch on two other issues. The Appellate Division concluded that the plain view exception to the warrant requirement applied to the seizure of the television and luggage in the motel room. *Earls, supra,* 420 *N.J.Super.* at 600, 22 *A.*3d 114. For the exception to apply, the State must show that (1) the officer was "lawfully in the viewing area," (2) the officer discovered the evidence " 'inadvertently,' meaning that he did not know in advance where the evidence was located nor intend beforehand to seize it," and (3) it was "immediately apparent" that the items "were evidence of a crime, contraband, or otherwise subject to seizure." *State v. Mann,* 203 *N.J.* 328, 341, 2 *A.*3d 379 (2010) (quoting *State v. Bruzzese,* 94 *N.J.* 210, 236, 463 *A.*2d 320 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984)).

The police located defendant in his motel room based on cell-site data they obtained without first getting a warrant. The State cannot show that the officers were lawfully in the motel room because their presence flowed directly from a warrantless search of T–Mobile's records.

The State also argues that another exception to the warrant requirement, the emergency aid doctrine, applies here. The doctrine applies when " 'exigent circumstances . . . require public safety officials, such as the police, firefighters, or paramedics, to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury.' " *State v. Edmonds,* 211 *N.J.* 117, 130, 47 *A.*3d 737 (2012) (quoting *State v. Frankel,* 179 *N.J.* 586, 598, 847 *A.*2d 561, *cert. denied,* 543 *U.S.* 876, 125 *S.Ct.* 108, 160 *L.Ed.*2d 128 (2004)).

The emergency aid exception to the warrant requirement now involves a two-part test. *Id.* at 131–32, 47 *A.*3d 737. To justify a warrantless search under the doctrine, the State must

prove that (1) "the officer had 'an objectively reasonable basis to believe that an emergency require[d] that he provide immediate assistance to protect or preserve life, or to prevent serious injury,'" and (2) "there was a 'reasonable nexus between the emergency and the area or places to be searched.'" *Id.* at 132, 47 *A.*3d 737 (quoting *Frankel, supra,* 179 *N.J.* at 600, 847 *A.*2d 561). Consistent with this Court's recent decision in *Edmonds* and recent federal precedent, we no longer consider the officer's motivation for entry into the home. *Id.* at 131–33, 47 *A.*3d 737.

Because the Appellate Division found that defendant had no privacy interest in his cell-phone location information and that the plain view doctrine applied, the panel had no reason to consider the emergency aid doctrine. We note that defendant did not present written argument directly to this Court on the point and that the State's submissions rely on the outdated three-part test that *Edmonds* revised.

For all those reasons, we remand the matter to the Appellate Division to determine whether the emergency aid doctrine applies to the facts of this case under the newly restated test.

## VII.

For the reasons set forth above, we reverse the judgment of the Appellate Division and remand the matter there for further proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, PATTERSON, and Judges RODRÍGUEZ (temporarily assigned) and CUFF (temporarily assigned)—7.

*Opposed*—None.