**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0392-21
     A-1828-21
     A-2728-21

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

JAMEL LEWIS,
a/k/a ADUAL LEWIS,
TAREAK BOND, JAMAL BROWN,
ADWAL LEWIS, JAMAL LEWIS,
JAMIL LEWIS, KIREESE OCONNOR,
KIRESE OCONNER, JAMIL KHAN,

  Defendant-Appellant.

_____

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

SHARIF TORRES,

  Defendant-Appellant.

_____

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ROBERT HARRIS,

    Defendant-Appellant.

_____

Submitted (A-0392-21 and A-1828-21) and Argued (A-2728-21) March 18, 2024 – Decided March 28, 2024

Before Judges Mawla, Chase, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 10-03-0288.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant Jamel Lewis (Steven M. Gilson, Designated Counsel, on the brief).

Jennifer Nicole Sellitti, Public Defender, attorney for appellant Sharif Torres (Andrew Robert Burroughs, Designated Counsel, on the briefs).

Adam W. Toraya argued the cause for appellant Robert Harris (Bailey & Toraya, LLP, attorneys; Adam W. Toraya, on the brief).

William C. Daniel, Union County Prosecutor, attorney for respondent in A-0392-21 (Milton Samuel Leibowitz, Assistant Prosecutor, of counsel and on the brief).

Michele C. Buckley, Assistant Prosecutor argued the cause for respondent in A-2728-21 (William C. Daniel,

Union County Prosecutor, attorney; Michele C. Buckley, of counsel and on the briefs in A-1828-21 and A-2728-21).

Appellant Jamel Lewis filed a pro se supplemental brief.

PER CURIAM

Defendants Jamel Lewis, Sharif Torres, and Robert Harris, separately appeal from: July 29, 2021; July 24 and September 23, 2021; and July 29, 2021 and March 8, 2022 orders denying their respective petitions for post-conviction relief (PCR). We consolidate these appeals and affirm for the reasons expressed in this opinion.

I.

We previously recounted the facts when we affirmed defendants' convictions and sentences in State v. Lewis, Nos. A-2411-15, A-2550-15, and A-2551-15 (App. Div. Jan. 7, 2019) (slip op. at 2-9). To summarize, on October 28, 2008, defendants staged a kidnapping of Tanya Worthy from co-defendant Rashawn Bond's home and used her car to go to her boyfriend Rahim Jackson's home in Green Brook to rob him. While Jackson was home watching television, he heard the garage door open, and when he opened the door to the garage, he saw Worthy's car. A masked person emerged from the car holding a gun and told Jackson not to move. Jackson closed and locked the door, the gunman

returned to Worthy's car, and the vehicle left. Jackson ran to the home of a neighbor, who then called police. Approximately two hours later, first responders found Worthy's vehicle aflame. Once the fire was extinguished, they discovered Worthy's charred body. She died, having been shot three times prior to being burned.

The State's theory of the case was that Worthy had been killed in a robbery gone awry, and that Lewis and Bond thought they could use Worthy to gain entry to Jackson's home to rob him because he was allegedly a wealthy drug dealer. To accomplish the robbery, Lewis and Bond enlisted Harris, Torres, and an unindicted co-conspirator, Titus Lowery, as help. We described the role each defendant played as follows:

> According to the State, while Worthy was visiting Bond, with whom she was also romantically involved, defendants and Lowery stormed in, robbed her, and kidnapped her, and then Lewis and Lowery drove away in her car, with Worthy in the back seat, from Bond's Newark residence to Jackson's Green Brook residence. Bond, Harris, and Torres followed along in another car but didn't reach Jackson's residence in time to carry out the intended home invasion with Lewis and Lowery. Their plan botched, Lewis and Lowery fled Green Brook with Worthy still in the car, and Bond, Harris, and Torres changed course to meet up with them in Elizabeth to destroy the evidence, including Worthy and her vehicle.

A-0392-21

The defense disputed any connection between or among defendants or between or among defendants and Worthy. But witnesses testified at trial, often with reference to photographs, that Bond and Lewis were cousins and close friends, that both were acquainted with Harris, and that Harris was acquainted with Torres. One witness in particular, Sean Williams, testified that he encountered Lewis, a family friend, at a party in Irvington three days prior to the crimes; at that time, Lewis asked Williams to steal a four-door vehicle that he needed to commit . . . [the] home invasion and robbery . . . of "one of [Bond's] b[*****]s." Lewis promised Williams that Bond would compensate him, but Williams ultimately declined to steal the car Lewis sought.

As for defendants' connection with Worthy, Bond's cousin Terron Billups confirmed that Worthy and Bond had been romantically involved. And Jasmine Campbell, another girlfriend of Bond's, found Worthy's business card in a black leather handbag Bond gave Campbell just hours after Worthy's body was set on fire. The bag, which was eventually turned over to police, led the investigation to Bond and then defendants.

[Id. at 3-6 (second alteration in original).]

The State's case included cell-site location information (CSLI), which tracked phone numbers attributed to defendants, Bond, Lowery, and Worthy. The State also had call records for those phone numbers. It adduced testimony from telephone company records custodians about the call records and subscriber information for accounts belonging to Worthy, Lewis, Bond, and

5

Karima Rose; Rose testified Harris was using her phone at the time. Worthy's and Lewis's lines were on the Sprint network. A telephone company representative also identified Torres as a subscriber to an AT&T account "and a representative of the Philadelphia County Adult Probation Department testified, based on the department's records, about the phone number that Lowery provided to a probation officer who was collecting his basic contact information." Id. at 7.

Engineers from AT&T and Sprint were qualified as experts in CSLI information. The Union County Prosecutor's Office prepared maps "that plotted the cell sites with which the phone for each account made connections during the night in question. The individual who created the maps testified that he prepared them based on CSLI records obtained from the service providers for the respective phones." Ibid. We recounted what the CSLI evidence revealed:

> According to call records, Bond contacted Lewis, who then placed three calls to Harris during the afternoon. During a thirty-minute span beginning at around 5:30 p.m., while Worthy was at [a] Newark restaurant, Torres called Bond, who called Worthy, then Lewis, and then Worthy again. Around 7:00 p.m., both Worthy's and Bond's phones connected with a cell tower near Bond's Newark residence, supporting an inference that Worthy visited Bond after leaving the restaurant. Thirty minutes later, Worthy's phone, along with those used by Bond, defendants, and Lowery, all

6

connected with that same tower within a few minutes of one another.

Around 8:00 p.m., when the prosecution claimed the kidnapping occurred, the phones attributed to Lewis, Lowery, and Worthy began connecting with a westerly sequence of cell sites between Newark and Green Brook. Partway there, Worthy's phone abruptly ceased to track with the others and last connected with a site near the intersection of Interstate 78 and Route 24; her phone was later recovered by police on the side of the road in that vicinity.

Call records showed that while Lewis and Lowery were traveling with Worthy to Green Brook, Bond called Campbell—the girlfriend to whom he ultimately gave Worthy's handbag—several times, initially without success. Campbell testified that when Bond finally reached her at 8:19 p.m., he asked her to pick him up at a Newark intersection so she could lend him her car. She complied, and he left with her vehicle after dropping her off at her residence. CSLI records demonstrated that, soon thereafter, the phones attributed to Bond, Harris, and Torres all began connecting with a series of cell towers from Newark toward Green Brook.

At about 8:40 p.m., while the other three were on their way, Lewis's and Lowery's phones connected to a cell site across Route 22 from Jackson's Green Brook residence. That timing coincided with Jackson's recollection of when he encountered the masked individual, and briefly preceded his neighbor's phone call to police. Records confirmed that the neighbor's call was placed at 8:48 p.m. At the same time, phones belonging to Harris, Torres, and Bond were connecting to cell sites near Watchung, ten minutes' driving distance from Jackson's home. The same data revealed

7

an abrupt change in direction after the neighbor's call to police, showing that the phones used by the three began connecting with an easterly sequence of cell sites back toward Newark. Around the same time, Lewis's and Lowery's phones connected with a series of sites headed in the same direction between Green Brook and Newark. Call records also showed that Lewis and Harris were in constant contact during this period.

CSLI revealed that defendants and their cohorts converged at approximately 10:15 p.m., when their phones connected with a cell site in Newark about a mile from where Worthy was found burned inside her car. . . . Afterward, Shakeerah Scott, the mother of Lewis's child, testified that she picked up Lewis and two others at another Newark location; she gave them a ride to Lewis's car. Bond, meanwhile, returned Campbell's car to her at her house at 12:32 a.m., a time confirmed by the record of a phone call he placed to her announcing his arrival. When Campbell went outside to meet Bond, he handed her the car keys as well as the handbag in which she eventually found Worthy's business card.

[Id. at 7-10.]

Not long after defendants' trial, the United States Supreme Court decided Carpenter v. United States, 585 U.S. __, __ (2018) (slip op. at 17-18), which held individuals have an expectation of privacy in the records of their physical movements as captured by CSLI, and that the government's acquisition of CSLI constitutes a search. Following the appellate briefing, defendants filed supplemental briefs seeking a remand to adjudicate the validity of the

8

constitutionality of the State's acquisition of their CSLI and the propriety of the admission of this information at trial. We concluded their arguments were untimely and declined to consider them. Moreover, although Carpenter was decided after defendants' trial and pending their appeals, we noted "our Supreme Court had already recognized a reasonable expectation of privacy and established a warrant requirement for similar information in State v. Earls, 214 N.J. 564, 584 (2013)." Lewis, slip op. at 16-17. We also noted defendants never moved to suppress the CSLI nor objected to its admission. Id. at 17. Therefore, the record lacked the facts on which to determine whether Carpenter was violated, and the issue was not properly preserved for appeal. Ibid.

Defendants also argued the trial court abused its discretion when it admitted redacted gang photos featuring Harris and Torres. Id. at 35. At trial, defendants objected to the photos and sought to redact items indicative of gang membership, including bandannas, hand gestures, and other individuals in the photos whom the jury might associate with defendants. Id. at 36-37. The photos were redacted to remove the bandannas. Id. at 37. On appeal, defendants argued the redacted photos were nonetheless prejudicial and identified them as members of the Bloods gang. Ibid.

9

We concluded the court had not erred because the gang membership "argument was never asserted at trial and the photographs were never introduced to show gang affiliation." Id. at 38. Furthermore, "they were redacted specifically to remove the red bandannas and a sign mentioning 'B-Block,' the only obvious indicia of that affiliation, as well as the hand gestures mimicking holding a gun and [a] picture on [a] t-shirt, the only portions obviously suggestive of violence." Ibid. The photos were not completely sterile because they still "depicted individuals giving an obscene gesture, but that gesture is ubiquitous and not unique to gang members." Ibid. Indeed, no expert commented on the significance of the unredacted hand gestures "at trial, so there was no reason to believe a juror would draw an inference that the individuals depicted were gang members." Ibid.

Defendants also argued there was insufficient evidence to support their convictions at trial because the State's evidence was circumstantial and most of it was data, which "inexactly established their locations at certain times." Id. at 41. We found otherwise, for the following reasons:

> The significance of CSLI to this case was not that it ambiguously placed defendants at approximate locations at any one particular time, but that it demonstrated the unusual coincidence of their locations and directions of travel throughout the extended period during which this sequence of crimes occurred and

during which call records revealed they remained in contact with one another. Harris and Lewis remained in frequent contact throughout, and Lewis and Torres were both in contact with Bond just before the kidnapping. CSLI then showed that all three converged in the vicinity of Bond's home at the same time Worthy was there, and that the two sets of cohorts separately made their way west toward Green Brook and then suddenly east back toward Newark after Jackson encountered the masked individual in Worthy's car. Though Harris and Torres failed to reach Green Brook by that time, a cell cite across the highway from Jackson's home placed Lewis there right in time for the encounter.

Harris is correct that the evidence showed he was not in the car with Worthy when she was driven to Green Brook. But he ignores that CSLI revealed he was proceeding in the same direction from the same starting point near Bond's home, that he abruptly changed directions at the time Jackson's neighbor called the police, and that he ended up in Elizabeth where Worthy's body was later found. The same can be said for Torres, whose phone followed the same approximate path. And so did that of Bond, whose gift of Worthy's handbag to Campbell ultimately steered the criminal investigation in defendants' direction.

Harris asserts in his pro se brief that the State failed to establish even that he was the user of the phone attributed to him because evidence showed several calls from that phone were likely placed by Bond. But Billups testified that he communicated with both Harris and Bond on that phone, and Rose, the subscriber on that phone's account, unequivocally testified that Harris was the phone's user when the crimes occurred. Lastly, insofar as Harris points out that Campbell never identified him as one of the individuals with Bond when

11

she lent Bond her car, and that Scott never identified him as one of those she picked up with Lewis later that night, neither fact, even taken at face value, undermines the evidence we have already summarized to a degree that would call into question the integrity of the jury's verdict.

[Id. at 41-43.]

II.

Each defendant filed a PCR petition. As relates to the issues raised on these appeals, all three challenged the admission of the CSLI evidence and claimed trial counsel were ineffective for not moving to suppress the evidence. Lewis and Harris argued counsel were ineffective for failing to retain a CSLI expert to rebut the State's proofs. Lewis and Torres asserted trial counsel were ineffective for not adducing alibi testimony. Torres and Harris claimed trial counsel coerced them not to testify and failed to fully advise them of their rights to testify in their own defense. Torres alleged counsel failed to review discovery with him and failed to move to suppress the gang member evidence. And Harris claimed ineffective assistance of appellate counsel for not having argued there was insufficient evidence to convict on appeal, and not moving to correct a factual error in the appellate opinion.

Judge John M. Deitch considered all three petitions and issued three written opinions, one for each defendant, on July 29, 2021. Lewis's petition was

denied without an evidentiary hearing. Torres's petition was mostly denied without an evidentiary hearing, except for, as relevant here, his claims trial counsel was ineffective for not pursuing an alibi witness, reviewing discovery, and failing to counsel him regarding the right to testify. Following the evidentiary hearing, the judge issued a September 23, 2021 written opinion denying Torres's petition. Harris's petition was also denied without an evidentiary hearing related to his claims against trial counsel, however, the judge conducted an evidentiary hearing to assess his claims against appellate counsel. The judge then issued his March 8, 2022 written opinion denying Harris's petition regarding the ineffective assistance of appellate counsel. We next address the judge's findings regarding each defendant related to the issues they now raise before us.

## A.

The judge found Lewis's claim trial counsel was ineffective for not moving to suppress the CSLI information lacked merit because the information was obtained pursuant to the search warrants, which the law treats as presumptively valid. Lewis provided no evidence revealing the search warrants for the cell phones and the cell tower data "were based on any false statements in the police's certifications." Moreover, the judge who granted the warrants

found probable cause because the lead investigator certified Campbell provided him with her cell phone records and identified four numbers Bond used to contact her. The State's CSLI expert testified one of those numbers was subscribed to by Torres. Bond used that number the night of the killing to contact Campbell. Therefore, "trial counsel could not have filed a successful motion to suppress under Carpenter or Earls" because "[t]here was ample probable cause to support the issuance of the CDW [communications data warrant] seeking, inter alia, CSLI, for these telephone numbers."

Lewis argued Laquan Bond would have been a partial alibi witness and adducing his testimony at trial would have rebutted Williams's testimony that Lewis asked Williams to steal a car for the robbery. Further, the defense provided a certification from Maurice Williams that his brother Sean is a liar and that Maurice[1] did not see Laquan[2] or Lewis at the party in which Lewis asked Williams to steal the car.

---

[1] We use Maurice Williams's first name because he shares a surname with Sean Williams. We intend no disrespect. From here on, when we refer to "Williams," we intend Sean Williams.

[2] We use Laquan Bond's first name because he shares a surname with Rashawn Bond. We intend no disrespect. From here on, when we refer to "Bond," we intend Rashawn Bond.

A-0392-21

The judge rejected Lewis's argument regarding Laquan because Lewis did not tell trial counsel about Laquan prior to trial and did not certify to the alibi as part of the PCR petition. Moreover, Laquan was not an alibi witness but a witness the defense could use to attack Williams's credibility. Therefore, the judge found "any benefit would be tangential, at best. Furthermore, if Laquan . . . was shown to be incredible, that . . . could have a devastating effect upon . . . Lewis." The judge noted Lewis's petition was "not critical of trial counsel not contacting Maurice," nonetheless, Lewis had "not made any showing that would require a hearing on trial counsel's actions regarding Laquan . . . or Maurice."

Lewis's petition included a report from a cell-site expert. However, the judge found it did "not create a question warranting a hearing" because the defense expert did "not dispute the location of the cell-towers[,] . . . [or] dispute that one can get a general sense of where a cellphone is based upon which tower it is connecting to," nor did he "point to any error in the data used to plot the tower maps or the calls themselves." The defense expert report corroborated the State's expert, who testified at trial that call detail records do not indicate the caller's precise location and, even though the precise location is unknown, the cell tower and sector used by the phone is known. The judge found the balance

15

of the defense expert report merely criticized the State expert's maps for not "showing the sectors geographically for each phone call" and trial counsel's cross-examination of the State's expert. Lewis failed to make a prima facie showing that warranted a hearing on the CSLI testimony because the State's expert explained why the tower sectors were not on the map and the defense expert failed to explain how trial counsel's cross-examination was deficient.

B.

The judge found Torres's claim that his counsel was ineffective for not suppressing the gang member evidence was procedurally barred because Torres conceded his attorney objected to the evidence, but it was admitted over his objection. Even if the issue were not procedurally barred, the judge pointed out that we addressed and rejected defendants' arguments related to the admissibility of this evidence in the prior appeal. He added "the hand signs [were] ubiquitous and not specific to gangs . . . so there was no reason for jurors to believe they were associated with gangs." The judge rejected Torres's argument his counsel was ineffective for not moving to suppress the CSLI evidence for the same reasons expressed in Lewis's petition. However, he ordered an evidentiary hearing regarding the claims defense counsel failed to review discovery,

16

investigate an alibi witness, and explain defendant's state and federal constitutional rights to testify in his own defense.

Both defense attorneys and Torres testified at the evidentiary hearing. Judge Deitch made detailed credibility findings, which we need not repeat here, and concluded both attorneys were credible, and Torres was not. The judge detailed the level of communication both attorneys had with Torres and concluded the credible evidence showed they provided the discovery to Torres and discussed it with him. Counsel had a good rapport with Torres; "[t]hey had a free exchange of ideas"; and Torres knew the State's case "came down to 'the phone and whether [he] possessed the phone.'"

Torres claimed his employer was his alibi because she would have testified he was at work hanging Halloween decorations at the time of the kidnapping. Pursuant to the testimony, the judge concluded defense counsel did investigate the alibi by speaking to Torres's employer, but "she had no information to support an alibi for the day in question." Moreover, Torres's employment application was unsigned, and he had given investigators a statement that he did not begin working for this employer until after the killing. Therefore, counsel exercised appropriate judgment by deciding not to call the employer because it "would have been substantially detrimental to the defense."

 A-0392-21

Torres's second alibi witness was a man named "Fat Mike" who Torres claimed was Bond's cousin.  Torres asserted he lent his phone to Fat Mike and Fat Mike's testimony would disprove the State's CSLI evidence showing Torres was with the other defendants the night of the murder.  The judge found defense counsel was not ineffective for failing to investigate this alibi witness because Torres never told counsel about the witness and the alleged alibi was "a post-hoc contrivance by [Torres]."  Indeed, Torres provided "no particulars concerning [the alleged alibi witness] to support his existence."  The testimony at the evidentiary hearing convinced the judge "trial counsel appropriately and effectively reviewed the discovery with [Torres who] was well aware of . . . the charges . . . and . . . the State's proofs . . . against him.  He appreciated that the case would hinge on connecting the cellular telephone to him."  Therefore, the judge found it was "beyond belief" Torres would have withheld information from his attorney about who he lent his phone to.

The judge rejected Torres's claim he was not counseled about his right to testify.  In addition to the fact the trial court had voir dired Torres about the right to testify, the evidentiary hearing established Torres and defense counsel "were in free and open communication [with another].  They were at the trial together daily."  The judge credited defense counsel's testimony that he informed Torres

18

of the "right to remain silent, that the State could use his prior convictions against him, and that he would be subject to cross-examination if he chose to testify. He also discussed what [Torres] would 'add' to the case if he chose to testify." However, given counsel's cross-examination of the lead investigator on the issue of Torres lending his phone out to Fat Mike, the judge found "there was little that [Torres] could add." Indeed, the judge had found Torres "to be incredible, and it [was] highly likely a jury would have as well." There was no evidence in the record showing Torres wanted to testify. The judge concluded defense counsel had "appropriately counseled [Torres] on the issue, and [Torres] made a fully informed decision to remain silent of his own free will."

## C.

Judge Deitch found Harris's claim he was pressured by trial counsel not to testify was "directly contradicted by [the] record at trial." The trial court had voir dired Harris on the matter and he unequivocally said that he did not wish to testify and no one had forced him into the decision. Harris also told the trial court he understood the decision whether to testify was his to make. Further, it was not duress for trial counsel to tell Harris the jury would not believe him if he testified because it was counsel's obligation to inform him whether it was wise to take the stand. The evidence supported the fact Harris should not have

19

testified because he did not deny being in New Jersey on the day of the crime, he made no reference to an alibi, and he did not explain how someone other than him would have had his phone during the incident.

The judge rejected the claims trial counsel was ineffective for not having suppressed the CSLI evidence or retained a CSLI defense expert for the same reasons as the other defendants. However, the judge ordered an evidentiary hearing to address Harris's claim appellate counsel failed to communicate with him and did not respond to a request to correct an error in the appellate decision affirming his convictions and sentence.

Harris and appellate counsel testified at the evidentiary hearing, after which the judge issued a written decision denying the remaining PCR claims on March 8, 2022. The judge found appellate counsel credible and Harris not credible. Harris's testimony at the evidentiary hearing contradicted his claims appellate counsel did not communicate with him because: he admitted he spoke with appellate counsel; raised issues he wanted argued with counsel, including issues related to the sufficiency of the evidence presented at trial; and appellate counsel told him he could raise those issues in a pro se brief, which Harris did file.

The error Harris claimed appellate counsel failed to address was our finding that Billups testified Harris called him on the Rose cell phone. Appellate counsel testified he did not recall the error, but having reviewed it at the evidentiary hearing, he concluded it would not change the outcome of the appeal. Moreover, the judge found Harris "admitted that he knew [four women with whom he had relationships] and that he spoke to them all on the Rose phone the day before and the day after the killing. However, he did not speak to them on the day of the killing through that phone." Therefore, there was no error in the appellate decision to correct.

Even if Harris were correct about the error, the judge found it would not have changed the outcome because "there was very strong circumstantial evidence linking [Harris] to the Rose phone, and the Rose phone to the co-defendants at trial." Indeed, Rose testified at trial that she considered Harris family and she had given him the phone, and he would pay the bill. "Sometimes, when she would call the number, others would answer[,] and she would leave a message for [Harris]." He would call her from Rose the number. And the Rose number received a call from Harris's girlfriend while the phone was in Newark early in the morning of the killing.

A-0392-21

Campbell identified four telephone numbers Bond used to contact her in October 2008. Two of those numbers exchanged calls with the Rose number on the day of the killing. At trial, a T-Mobile representative testified to the exact times the Rose phone exchanged calls with Bond's number as well as the exact time and duration of the calls between Rose and Lewis's phone. The representative explained the Rose "phone hit off cell towers in Irvington, Newark, Hillside, Springfield, and Nutley during the pertinent hours of October 28, 2008." The lead investigator testified the Rose phone was in contact with Lewis's phone "between approximately 7:28 p.m., and 9:39 p.m." and "hit off multiple cell towers between Newark and . . . Worthy's home" the night of the killing.

Therefore, the judge concluded "there was ample evidence for a jury to find that [Harris] committed the crimes he was found guilty of." Moreover, appellate counsel did argue the weight of the evidence on appeal because

> [i]n Point 1A of the appellate brief, counsel argue[d] that: "[t]he evidence against . . . Harris was insufficient as a matter of law, or at least should have been set aside as a manifest denial of justice." Counsel then goes on to detail the evidentiary shortcomings in his statement of facts[ and] . . . then argued [the point] cogently over five pages in the brief.

22

Furthermore, [Harris] submitted a pro se brief, where he raised the same issues addressed by appellate counsel.

[(Second alteration in original).]

The judge noted appellate counsel specifically attacked the fact the State's evidence did not meet the burden of proof to show Harris had any involvement in the crime, including that there was no evidence "Harris knew Worthy or ever called [her] cell phone."  Appellate counsel also argued even though the State attributed the Rose phone to Harris, "there is no direct evidence that Harris was in fact operating this phone[] and the cell phones attributed to . . . co-defendants."

### III.

In A-0392-21, Lewis raises the following points on appeal:

> THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE . . . DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF TRIAL COUNSEL'S INEFFECTIVENESS BY NOT SEEKING EXCULPATORY WITNESSES.
>
> A. Trial Counsel Failed to Pursue an Expert Witness to Rebut the State's Expert Witness Regarding the Operation of Cellphone Towers.
>
> B. Trial Counsel Failed to Pursue Laquan . . . and Maurice . . . to Rebut the Testimony of . . . Williams.

23

Lewis's pro se supplemental brief raises the following points:

POINT I

TRIAL COUNSEL WAS INEFFECTIVE FOR FAILURE TO FILE A SUPPRESSING MOTION FOR THE ILLEGAL [CDW].

POINT II

TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO HIRE A DIGITAL FORENSIC EXPERT WITNESS DURING TRIAL.

POINT III

THE STANDARD FOR AN EVIDENTIARY HEARING HAS BEEN MET.

In A-1828-21, Torres argues the following points on appeal:

POINT I

AS DEFENDANT HAD SHOWN THAT HE RECEIVED INEFFECTIVE . . . ASSISTANCE OF COUNSEL, THE PCR COURT ERRED BY DENYING DEFENDANT'S PCR PETITION.

(1) Trial counsel failed to consult with his client and adequately prepare for trial.

(2) Trial counsel's failure to fully investigate an alibi defense denied defendant his constitutional right to effective legal representation and a complete defense.

(3) As trial counsel failed to adequately advise defendant about the advantages of testifying at trial, defendant did not make an informed decision when he waived his constitutional right to testify.

(4) Trial counsel failed to move to suppress prejudicial gang related evidence.

(5) As the search warrant failed [to] establish sufficient probable cause that defendant had committed a crime, trial counsel's failure to file a motion to suppress was prejudicial.

And in A-2728-21, Harris raises the following points for our consideration:

POINT ONE

DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS APPELLATE ATTORNEY FAILED TO ADEQUATELY RAISE A POINT ON DIRECT APPEAL IN VIOLATION OF U.S. CONST. AMENDS. VI, XIV; N.J. CONST. (1947) ART. I, PAR. 10.

POINT TWO

THE COURT ERRED IN DENYING THE REMAINING POINTS IN THE PETITION FOR [PCR] WITHOUT AFFORDING HIM AN EVIDENTIARY HEARING TO FULLY ADDRESS HIS ASSERTION THAT HE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

A.

25

PCR "is New Jersey's analogue to the federal writ of habeas corpus." State v. Afanador, 151 N.J. 41, 49 (1997) (citing State v. Preciose, 129 N.J. 451, 459 (1992)).  It provides a "built-in 'safeguard that ensures that a defendant was not unjustly convicted.'" State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. McQuaid, 147 N.J. 464, 482 (1997)).  It affords a defendant a final opportunity to raise any legal error or constitutional issues, including a violation of the right to effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution.  Afanador, 151 N.J. at 49-50; McQuaid, 147 N.J. at 482.  "Ordinarily, PCR enables a defendant to challenge the . . . final judgment of conviction by presenting contentions that could not have been raised on direct appeal." Afanador, 151 N.J. at 49 (citing McQuaid, 147 N.J. at 482-83).

The Constitution requires "reasonably effective assistance," so an attorney's performance may not be attacked unless he or she did not act "within the range of competence demanded of attorneys in criminal cases" and instead "fell below an objective standard of reasonableness." Strickland v. Washington, 466 U.S. 668, 687-88 (1984) (quoting Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)).  In addressing an ineffective assistance claim, we follow the two-pronged standard formulated by the United States Supreme Court in Strickland,

which was adopted by the New Jersey Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987). "That is, the defendant must establish, first, that 'counsel's representation fell below an objective standard of reasonableness' and, second, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" State v. Alvarez, 473 N.J. Super. 448, 455 (App. Div. 2022) (quoting Strickland, 466 U.S. at 688, 694). "With respect to both prongs of the Strickland test, a defendant asserting ineffective assistance of counsel on PCR bears the burden of proving [their] right to relief by a preponderance of the evidence." State v. Gaitan, 209 N.J. 339, 350 (2012). A failure to satisfy either prong of the Strickland/Fritz test requires the denial of a petition for PCR. State v. Parker, 212 N.J. 269, 280 (2012).

"To establish a prima facie case [for PCR], defendant must demonstrate a reasonable likelihood that his or her claim, viewing the facts alleged in the light most favorable to the defendant, will ultimately succeed on the merits." R. 3:22-10(b); State v. Porter, 216 N.J. 343, 355 (2013). "[A defendant] must do more than make bald assertions that he was denied the effective assistance of counsel." Porter, 216 N.J. at 355 (quoting State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999)).

27

"Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. Reviewing courts must make "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Ibid. Indeed, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. The burden rests with the defendant to rebut this strong presumption that counsel's performance was adequate. Ibid. Further, because prejudice is not presumed, Fritz, 105 N.J. at 52, the defendant must demonstrate "how specific errors of counsel undermined the reliability" of the proceeding. United States v. Cronic, 466 U.S. 648, 659 n.26 (1984).

As relates to claims against "appellate counsel[, they do] not have a constitutional duty to raise every nonfrivolous issue requested by the defendant." State v. Morrison, 215 N.J. Super. 540, 549 (App. Div. 1987) (citing Jones v. Barnes, 463 U.S. 745, 755 (1983)). Counsel will not be found ineffective for failure to raise a meritless issue or errors an appellate court would deem harmless. State v. Echols, 199 N.J. 344, 361-62 (2009).

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular

A-0392-21

case, viewed as of the time of counsel's conduct."  Strickland, 466 U.S. at 690.

The court must "determine whether, in light of all the circumstances, the

identified acts or omissions were outside the wide range of professionally

competent assistance."  Ibid.

"The mere raising of a claim of [ineffective assistance of counsel] does

not entitle the defendant to an evidentiary hearing."  State v. Peoples, 446 N.J.

Super. 245, 254 (App. Div. 2016).  A court should hold an evidentiary hearing

on a petition only if the defendant establishes a prima facie case in support of

PCR, "there are material issues of disputed fact that cannot be resolved by

reference to the existing record," and "an evidentiary hearing is necessary to

resolve the claims for relief."  R. 3:22-10(b).

We will uphold a PCR court's factual "findings that are supported by

sufficient credible evidence."  State v. Gideon, 244 N.J. 538, 551 (2021)

(quoting Nash, 212 N.J. at 540).  Review of a PCR court's interpretation of the

law is de novo.  Nash, 212 N.J. at 540-41.  We review a PCR judge's decision

to deny a defendant's request for an evidentiary hearing under an abuse-of-

discretion standard.  See State v. L.G.-M., 462 N.J. Super. 357, 365 (App. Div.

2020).  And where the PCR judge does not hold an evidentiary hearing, our

review of both the factual inferences drawn from the record by the PCR judge

29

and the judge's legal conclusions is de novo. State v. Aburoumi, 464 N.J. Super. 326, 338 (App. Div. 2020).

Having considered each defendant's contentions pursuant to these legal principles, we affirm for the reasons expressed in Judge Deitch's thoughtful and well-written opinions. Our de novo review of the findings he made without an evidentiary hearing, and our review of the findings following the evidentiary hearings he conducted, convince us he neither misapplied the facts nor misinterpreted the law. His findings are amply supported by the evidence in the record and are unassailable. For these reasons, we conclude the arguments raised in each appeal lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed in A-0392-21, A-1828-21, and A-2728-21.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION